## MOORE *v.* BRAY.

A surety obtained from the principal, an assignment of a mortgage as an indemnity, from which he received a certain sum. The lands of his co-surety were sold to pay the debt of the principal. The creditors of such co-surety, whose liens were disappointed by such sale, have the right, with the consent of the co-surety, to be subrogated on the judgment held by the original creditor against the surety, to the extent of one-half of the amount thus received by him from the mortgage and applied to the payment of the joint liabilities of the sureties which had been satisfied.

And they are also entitled to be subrogated for the whole amount of a fund remaining in his hands, received from the estate of the principal, to be applied to such liabilities which were satisfied.

Communications of the object for which an assignment of a mortgage was made to a counsel concerned for the assignee on the distribution of the proceeds of the mortgaged premises, are privileged, although no question there arose as to the object of the assignment, and the counsel considered the communications in the light of a casual conversation.

In error from the Common Pleas of Cumberland.

This was a petition by S. Woods, Jr., and several of his judgment-creditors, praying to be subrogated in the place of Bray &

Barcroft, in two judgments they held against William Moore. The petition set forth that S. Woods, Jr., and William Moore were sureties for N. W. Woods, in debts owing to Bray & Barcroft and others. Judgments had been obtained by Bray & Barcroft in April, 1844, for $2,450. N. W. Woods was also indebted to other persons, to the amount of $4,608. William Moore was also his surety for these debts, and S. Woods, Sr., was his surety for $650, part of the same. In November, 1843, N. W. Woods confessed a judgment for $4,608, to William Moore, to secure him and S. Woods, Jr., and S. Woods, Sr. Under an execution on this judgment, $2,597.44 were levied.

N. W. Woods was also the holder of a mortgage given by John Moore, of which he assigned to William Moore $2,450, on the 23d of December, 1843, to secure him from his said liabilities for N. W. Woods. The land was sold by the sheriff, and out of the proceeds $1,313.50 were paid, by virtue of the assignment, to the judgments of Bray & Barcroft. Since then the real estate of S. Woods, Jr., had been sold by the sheriff, and out of the proceeds the balance of Bray & Barcroft's judgment had been paid, amounting to $1,516.21. That Moore had also received $301.35, belonging to N. W. Woods, with his consent. The lien-creditors of S. Woods, Jr., whose lands had been applied to the payment of N. W. Woods' debt to Bray & Barcroft, prayed to be subrogated to that extent, viz., $1,516.21, on their judgment against William Moore.

The answer of Moore stated that he had received on the execution against Woods but $1,893.92. That, under the mortgage, he received $1,313.59, and, after paying counsel fees, &c., there remained but $1,163.59, and he denied that the assignment was made for the purposes stated in the petition. As to the $301.35, they were not received on account of such liabilities, nor had they any connexion therewith. He further averred that N. W. Woods was indebted to him exceeding $2,000.

The evidence, proving that this mortgage was assigned for William Moore's indemnity, as surety for N. W. Woods, is stated in the opinion of this court. Mr. Graham, one of the witnesses for the petitioner, was the attorney for Moore, and drew the confession of judgment to him by N. W. Woods. The assignment of the mortgage was not drawn by him, but he was employed as his counsel, on questions arising on the distribution of the money on the execution under which the property was sold. While that case was pending, Moore communicated to him the object of the assignment. The witness said it was not necessary to him as

counsel, and he considered it in the light of a casual conversation; and whether Moore considered them as made in the character of a client, he could not say. The purpose of the assignment never came in question in the cause in which he was concerned as counsel.

As to the $301, it was proved that Moore had returned the amount to Woods. The evidence also showed that after Moore had applied the proceeds of his execution of his judgment against N. W. Woods to the payment of his liabilities, as his surety, there remained in his hands a balance of $70.23, $1,163.69 of that fund having been applied to the payment of Bray & Barcroft's debt, for which they had judgments against Moore and S. Woods, Jr., and that the amount paid towards Bray & Barcroft's judgments against Moore and S. Woods, Jr., out of the mortgage assigned to him by N. W. Woods, was $1,525.24.

The lien-creditors of S. Woods, Jr., whose liens had been deferred by the execution on Bray & Barcroft's judgment, were decreed to be subrogated on his judgment against Moore to the extent of the balance in his hands, and the one-half of $1,525.24, it being shown that N. W. Woods was insolvent.

The formal objections were: 1. That the creditors united in the petition. 2. The petition did not set forth the amounts due to each. Their judgments were referred to. 3. The petition was not sworn to but by one of them.

The case was brought up by writ of error, but that objection was abandoned.

*Todd* and *Moore*, for plaintiffs in error—On the inadmissibility of the attorney as a witness, cited 3 Y. 4; 4 T. R. 758; 3 W. 27; 4 J. B. Mo. 357; 2 Br. & Bing. 1; 4 Esp. 235; 5 Ib. 52; 1 M. & K. 98; 13 John. 492; 4 Munf. 273. The creditors here are not creditors of Moore, nor of N. W. Woods. Substitution is only allowed against a common debtor: 3 Barr, 300; 1 Ib. 518; 6 W. 227; 9 Ib. 451; 2 R. 131; 1 W. & S. 155.

*Biddle* and *Reed*, contrà—On the first point cited Tam. Ev. 56; 4 Mad. 54; 3 My. & Cr. 515; 1 Greenl. Ev. §§ 244–5; 14 Pick. 416; 1 Car. & Marsh. 123. The evidence shows that one surety received funds to indemnify him from the joint liability; his co-surety and his creditors, with his consent, whose liens have been destroyed by the execution for the joint debt, are entitled to be subrogated against such surety to the amount thus received on the

original judgment: 6 W. 221; 2 Pa. 298; 2 R. 128; 9 W. 451; 1 W. & S. 155.

*June* 11. BELL, J.—It is conceded that Samuel Woods, Jr., and William Moore, were the sureties of N. W. Woods, in the judgments recovered against them by Bray & Barcroft. According to the statement of the petitioning creditors of Woods, Jr., the sum of $1,163.59, applied by William Moore in part satisfaction of those judgments, was derived from the principal debtor, under the mortgage assigned by him to Moore. The balance due under the judgments, $1,525.26, and which was paid in full satisfaction of them, was made from the sheriff's sale of the real estate of Woods, Jr., and applied in detriment of his subsequent lien-creditors. If this statement is true, Woods, Jr., one of the sureties, paid all that remained due, after the means of the principal debtor were exhausted; for Moore was but the agent of the latter in the collection and application of the mortgage-moneys. For the present, I put out of view the judgment confessed by N. W. Woods to Moore and Capt. S. Woods, about which there appears to be no dispute. The case thus presented is the ordinary one of a co-surety, who has paid the debt of his principal, calling upon his fellow to bear his proportion of the common burden, with this addition, that here the call is made in favour of the paying surety's lien-creditors, who have been balked of payment of their several judgments by the application of their debtor's encumbered estate, in discharge of a prior lien, one-half of which the defaulting surety ought to have satisfied. The means proposed to reach the non-paying surety, is to give to the petitioning creditors, as against Moore, the benefit of Bray & Barcroft's judgments, by subrogation, to the extent of Moore's default. That, under the circumstances which have place here, the paying surety is entitled to this equity, does not, with us, admit of doubt: Fleming *v.* Beaver, 2 R. 128; Croft *v.* Moore, 9 W. 451. O'Neil *v.* McClure, and Neff *v.* Miller, 8 Barr, 347, establish that it may also be extended to the disappointed lien-creditors of the surety, at least with his assent, where no countervailing equity resides in the antagonist party. This is not asserted here, and consequently the path, upon the statement of the creditors, lies unobstructed before them.

But Moore denies that any portion of the mortgage held by N. W. Woods was transferred to him for the purpose of applying its avails in satisfaction of Bray & Barcroft's judgments, and we are left to infer—for there is no direct assertion to that effect—that the

money actually paid by him in part discharge of the judgments, was derived from his own resources. He therefore claims to occupy the position of one who has paid nearly his proportion of the common debt.

The controversy is thus reduced to a simple question of fact, to be determined upon all the evidence. The witness upon whom the petitioning creditors principally rely, is James H. Graham, Esq. He distinctly proves Moore's acknowledgments, that the consideration which moved to the assignment of the mortgage, was the liability of the latter, as the surety of N. W. Woods, and the desire of the principal debtor to secure and indemnify him against this liability. Accepting this testimony as competent, no room is left for hesitancy as to the fact. We think, however, it is more than doubtful whether it ought to be received for this purpose. All that Mr. Graham knows on the subject, was derived from Moore himself, and it pretty clearly appears these communications were made to the witness professionally, while in the exercise of his vocation of attorney at law. In direct connexion with the transactions that gave birth to this dispute, Mr. Graham was called on by Moore, to prepare an amicable confession of judgment, by N. W. Woods, in favour of Moore and Capt. Woods, the avowed object of which was to cover the liabilities of these gentlemen, as sureties of the defendant in that judgment. This was communicated to Mr. Graham professionally. On this point, however, no difficulty is made, for, that such was the consideration of the confessed judgment, is everywhere conceded.

This was in November, 1843; and, in the following month, the transfer of a portion of the mortgage-moneys was made. After this, Moore again called on Graham, and retained him, professionally, to attend to his interests in a dispute which had arisen touching the transfer. The communications, of which the witness speaks, were made while this relation of counsel and client existed, for so Mr. Graham states explicitly, on cross-examination. That they were made to him in his character of legal adviser, and in direct reference to his having been so retained, is shown, I think, by the whole scope of the deposition. They fall directly, then, within the circle of privileged communications, of which reasons of public policy forbid the disclosure; not because of a privilege enjoyed by the counsel, but for the safety of the client. It is of infinite consequence to suitors, that the trust reposed in professional men should not be violated: Heister *v.* Davis, 3 Y. 4. "If," said Lord Brougham, in Bolton *v.* The Corporation of Liverpool, 1 My. & K. 95, "such communications were not protected, no man

would dare to consult a professional adviser, with a view to his defence, or to the enforcement of his rights; and no man could safely come into a court, either to obtain redress or to defend himself." The rule has ever been sedulously maintained, within reasonable bounds; for, without it, the administration of the law would frequently become a trap, through the disloyalty of those to whose skill in jurisprudence the unlearned of the community are compelled to apply, in the innumerable instances which become the subject of judicial investigation. The intolerable evils attendant upon such a risk, are well depicted in Greenough v. Gaskell, 1 My. & K. 101, where the Lord Chancellor was assisted by some of the leading English judges, recognised by our own case of Beltzhoover v. Blackstock, 3 W. 27. Though, at one time, a doubt seems to have been entertained, it is now fully established, that it is not essential to the protection of professional communications, that a judicial proceeding should be actually pending, or even contemplated. It is enough, if the matter in hand may become the subject of judicial inquiry; and the employment of counsel is so connected with his professional character as to afford the presumption that this formed the ground of the confidence reposed: Greenough v. Gaskell, suprà; Ex parte Aitkin, 4 B. & Ald. 47; Knight v. Turquand, 2 M. & W. 101; Foster v. Hall, 12 Pick. 89. But, in our case, there was actually lis pendens; and the conversations proposed to be proved, by the attorney, were held in relation to it. It seems, however, to have been thought that, because the facts disclosed, in reference to the consideration of the assignment of the mortgage, were unessential to the conduct of the suit, and the communications regarded by the counsel in the light of casual conversations, they are not entitled to protection. But this is a mistake. It is true, the rule does not embrace the disclosure of collateral facts, made during accidental conversations, held irrespective of the professional character of the recipient. But the circle of protection is not so narrow as to exclude communications a professional person may deem unimportant to the controversy, or the briefest and lightest talk the client may choose to indulge with his legal adviser, provided he regards him as such, at the moment. To found a distinction on such a ground, would be to measure the safety of the confiding party by the extent of his intelligence and knowledge, and to expose to betrayal those very anxieties which prompt those in difficulty to seek the ear of him in whom they trust, in season and out of season. The general rule is, that all professional communications are sacred. If the

particular case form an exception, it must be shown by him who would withdraw the seal of secrecy, and, I think, should be clearly shown. This has not been done in the present instance. On the contrary, all the circumstances concur in proving that Mr. Graham's knowledge of the principal fact he was called to prove, is derived from a source the law regards as technically confidential. We are all, therefore, of opinion his testimony ought not to be considered in deciding this dispute. It is due, perhaps, to the highly respectable witness to say, that, as he doubted upon this point, he violated no duty in submitting the question to the proper tribunal, through the medium of his deposition. But, setting this deposition altogether aside, enough remains to satisfy the inquirer that the object of the transfer of the mortgage was that alleged by the creditors of Woods, Jr.

The judgment confessed by N. W. Woods, in favour of Moore and Captain Woods, in November, 1843, had partially failed of its intended effect. After applying all that was made under it, in discharge of debts for the payment of which the plaintiffs in it were sureties of the defendant, but $70.23 remained applicable to Bray & Barcroft's judgments. This sum was never so applied. It yet remains in Moore's hands. The amount then due under those judgments was $2,450. This is precisely the proportion of the mortgage security, which, in December following, was transferred to William Moore. The written instrument of assignment, by which this transfer was effected, does not state the consideration or the object of it. In his answer to the creditor's bill, Moore contents himself with a simple denial of their allegation that the transfer was intended as a further security against the liabilities incurred by Moore, as the surety of N. W. Woods, and it is not without significance that he declines to disclose wherefore this transfer was obtained from one then confessedly insolvent. But John Moore, who was called by the now defendant, testifies that, in a conversation held with N. W. Woods, some time after the sale of his personal property, under the judgment confessed by him to Moore and Capt. Woods, the witness urged the debtor to make some provision for his mother and sisters, to whom, it seems, he was indebted, and reminded him of the mortgage held by him against the witness, as affording a probable means of doing so. To this intimation, Woods replied, "There is William Moore, he will not be safe; there is not enough to pay him." Pending this conversation, William Moore came in and joined in it, when Woods again expressed his anxiety that Moore should be secured, as he

had always been his friend. John Moore then suggested an assignment to William Moore, of the balance remaining due on the mortgage, for the purpose of saving him and Woods' sisters. To this proposition, the latter immediately acceded, and he, with William Moore, went to the office of Mr. Watts to have it carried into effect. On their return, they informed the witness, the assignment was made to William Moore. Did the evidence stop here, the mind would be in doubt as to whether, in case of a deficient fund, the interests of William Moore were to take precedence of the sisters'. But, I think, the testimony of N. W. Woods himself, in connexion with another fact that I will presently notice, puts this doubt to flight. After stating that he had transferred to William Moore $2,450 of the sum secured by the mortgage, he says, " The consideration, or reason why the transfer was made, was because William Moore was deeply involved for me as my surety, and there was settlement of accounts to be made between us; and I wished to secure him in case I should fall in debt. 2d. And because of the arrangement made in the sale of the witness's farm to Captain Woods, he wished to secure something for his mother and two sisters." Here, it is evident the primary intent was to secure Moore, the provision for the mother and sisters being secondary. That, in making this arrangement, the parties had principally in view Bray & Barcroft's judgment, is, in some degree at least, evidenced by the fact already noticed, that the amount transferred exactly corresponds with the sum due under it; and the construction we have put upon Woods' testimony is almost certainly shown to be the true one, by the further fact that the sum realized by Moore, under the mortgage, viz., $1,163.59, is the precise amount paid by him in part satisfaction of Bray & Barcroft's judgment. This sum was received by Moore, on the 27th of December, 1844, and by him paid over on or before the 2d of January, 1845, for, on that day, its receipt is acknowledged upon the record of the judgment. In view of these undisputed facts, coupled with the reflection that no further settlement between Moore and Woods is pretended, and no arrangement in favour of the mother and sisters shown, the inquirer is compelled to the conclusion, that the mortgage was transferred to cover Moore's liability to Bray & Barcroft, and the avails of it so applied. If so, it of course enured to the benefit of Woods, Jr., the other surety: Agnew v. Bell, 4 W. 31.

On the argument, it was urged, that the latter had in his hands the means of payment, through his purchase of N. W. Woods'

farm, in connexion with Capt. Woods. But the history of this transaction is very obscurely given by John Moore. He discloses nothing which ought, in equity, to fix Woods, Jr., with the portion of the purchase-money released by the vendor. This point does not appear to have been urged below, and there is no sufficient foundation upon which to rest it here.

The objections taken to the sufficiency of the bill, filed by the creditors praying to be substituted, have not been insisted upon in this court. It is, no doubt, informal, and perhaps defective. But no exception was taken to it of record, and at the proper step of the cause, when it might have been amended. The parties seem to have acted under an agreement to investigate the merits of the controversy, irrespective of the formal manner in which it was introduced to the notice of the court. This was a waiver of formal, and perhaps of substantial deficiencies. But the averment of the latter is sufficiently answered by the learned president of the Common Pleas.

As to the sum of $70.23, balance of the amount received by William Moore, under the execution issued against N. W. Woods, and still remaining on hand, there is no room for dispute. It follows, that the conclusion at which the Court of Common Pleas arrived, was right, on all the points submitted. It is, accordingly, affirmed.

It may be well enough to mention, that the irregularity in bringing the case up by writ of error, was waived on the argument.

Proceedings affirmed.